JOURNAL ENTRY AND OPINION
{¶ 1} Appellant B.H. appeals the trial court's grant of permanent custody of her three minor children to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). Finding no merit to the appeal, we affirm.
 {¶ 2} This is a consolidated appeal of two cases heard in separate trials. In case No. 82258, the court granted permanent custody of B.H.'s older child, C.H., to CCDCFS, and in case No. 82852, the court granted permanent custody of B.H.'s twins, R.H. and T.H., to CCDCFS. The following evidence was presented at the two trials:
 {¶ 3} Although B.H. had been in agency custody since she was ten years old, she was in her mother's custody at the time she became pregnant with C.H. and was returned to agency custody shortly thereafter. B.H. gave birth to C.H. in August 1998, at age fifteen. C.H. was taken into agency custody in November 1998, but remained with B.H. while in agency custody at Marycrest.[1]
 {¶ 4} In July 1999, B.H. and C.H. moved to an independent living program. However, after one month in that setting, CCDCFS moved C.H. to a foster home because B.H.'s caseworker questioned B.H.'s judgment and decision-making regarding C.H.'s safety.
 {¶ 5} In September 2000, C.H. and B.H. were reunified after a previous motion for permanent custody had been denied and B.H. was granted legal custody. However, because B.H. herself remained in County custody until she reached age eighteen in September 2001, the County placed her with C.H. in the same foster home.
 {¶ 6} CCDCFS developed a case plan to assist B.H. in remedying the risks which prevented her reunification with C.H. The plan included parenting education, provision of basic needs, counseling, treatment for mental illness, anger management, and employment.
 {¶ 7} The foster parents tried to help B.H. achieve the goals of her case plan. They attempted to teach her how to manage a budget, assisted her in finding a job and obtaining her GED. B.H. obtained employment as a nurse assistant and the foster parents transported her to and from work. They also provided transportation to her GED and parenting classes.
 {¶ 8} However, B.H.'s placement in the foster home lasted only six weeks because she had several disagreements with the foster parents. Following an argument over budgeting, she did not come home from work for eleven hours after her shift ended. As a result of that incident, the County obtained emergency custody of C.H., who remained in the foster home until CCDCFS moved for permanent custody in April 2002.
 {¶ 9} While B.H. was attempting to meet the goals of the case plan, she gave birth to twins, R.H. and T.H. ("the twins") in March 2001. They were taken into agency custody at birth and were placed in foster care with another family. The twins were born five weeks premature, were medically fragile, suffered from low birth weight, and had specific needs requiring medication. The twins remained with their foster family until June 2001, at which time they were reunified with B.H.
 {¶ 10} The twins' foster family maintained contact with B.H. and the twins throughout the eleven months of reunification. They also provided assistance to her and the children in an effort to support her reunification attempt. During that time, B.H. often left the twins with them for days or weeks, stating that she needed time for herself away from the children. They also babysat for C.H. on occasion and provided food, clothing, diapers, and other necessities for the twins. The twins were again taken into agency custody in May 2002.
 {¶ 11} CCDCFS continued to work with B.H. on the previously developed case plan aimed at remedying the risks which prevented reunification with her children. As part of the case plan, B.H. was referred to five parenting programs but attended only two. However, her caseworker testified at trial that B.H. failed to demonstrate any benefit from the programs she completed. The caseworker also testified that B.H. continued to demonstrate poor judgment and decision-making in parenting the twins.
 {¶ 12} As part of the case plan, B.H. was referred to Dr. Melody Deogracias, who conducted a psychiatric evaluation and diagnosed B.H. with major depressive disorder recurrent with psychotic features. Dr. Deogracias recommended medication and counseling. Although Dr. Deogracias prescribed Prozac, B.H. failed to take her medication and failed to keep her appointments. B.H. was also referred for a psychological evaluation with Dr. Frank Ezzo of the Juvenile Court Clinic. Dr. Ezzo testified that B.H. suffers from severe depression with psychotic features, for which she was prescribed medication. She failed to take her medication and failed to attend counseling sessions as recommended. Dr. Ezzo stated that as a result of her mental illness, B.H. is unable to provide appropriate parenting to her children.
 {¶ 13} Dr. Ezzo also conducted interviews with C.H. and her foster family. Dr. Ezzo testified that C.H.'s primary bond is with her foster family. He described C.H.'s attachment to her foster family as a secure, healthy attachment which forms the basis for her development of interpersonal relationships throughout her life. He also described C.H.'s attachment to B.H. as an insecure, ambivalent attachment. Dr. Ezzo stated that removing C.H. from her foster family and placing her with B.H. would be damaging to C.H. and would compromise the child's ability to grow up to be a successful adult. Finally, Dr. Ezzo recommended an order of permanent custody for C.H.
 {¶ 14} Other witnesses corroborated Dr. Ezzo's testimony. B.H.'s caseworker testified that C.H. refers to her foster parents as "mommy and daddy," and considers their biological daughter to be her sister. B.H.'s caseworker also stated that C.H. often became hysterical at the prospect of leaving her foster home to visit with B.H., and indicated that she did not want to visit with B.H.
 {¶ 15} C.H.'s guardian ad litem noted in her report that "[C.H.] and [the foster sister] are strongly attached to each other." She further noted:
"[C.H.] has a strong and nurturing relationship with her fosterparents. She has spent the majority of her life in their care even when incustody of her mother. She is well integrated into their home and dailylife. C.H. has an incredibly strong bond with her younger foster sister ** *. They have been together since [the foster sister] was born. While inher foster home, C.H. has frequently visited with her twin sisters, whoare also in foster care. The foster families have included each other inall major celebrations and have arranged for the girls to visit onregular occasions. On the other hand, I have no evidence of any similarbond between [C.H.] and her biological mother."
 {¶ 16} C.H.'s guardian ad litem recommended that an order of permanent custody would serve C.H.'s best interests. She also claimed that C.H. "has stated unequivocally that she wishes to remain with her foster family."
 {¶ 17} At the conclusion of the first trial, C.H. had been in agency custody for over three years. Based on the evidence presented at trial and the recommendation of the guardian ad litem, the court awarded permanent custody of C.H. to CCDCFS.
 {¶ 18} In the second trial, there was evidence that B.H. often placed her own interests before those of the twins. The foster mother testified that B.H. spent money to have her tongue pierced and got a tattoo while the twins did not have suitable car seats and had to share a crib. She also claimed that B.H. sent money to her boyfriend/the twins' father, while he was in jail, even though she often had no baby food for the twins.
 {¶ 19} During the eleven months B.H. had custody of the twins, the foster family provided not only baby food, but also diapers, wipes, over-the-counter medications, and prescriptions. They often drove B.H. and the twins to school and to medical appointments. They also did B.H.'s laundry because neither she nor the twins had any clean clothes. When they made surprise visits to B.H.'s home, they often found it dirty and disorganized.
 {¶ 20} The foster family cared for the twins overnight on three out of every four weekends. One weekend, they cared for the twins overnight when they were sick. In the morning, they called B.H. to tell her that the twins needed immediate medical attention. B.H., who had legal custody of the twins, initially refused to go to the hospital with them until the foster parents eventually persuaded her to come with them. The twins were ultimately diagnosed with pneumonia.
 {¶ 21} The twins had experienced other respiratory problems. B.H. continued to smoke in their presence, even though she knew that such behavior directly aggravated their medical condition. The twins' guardian ad litem noted that the twins' "medical problems are often exacerbated while the twins are in [B.H.'s] care because she smokes and does not maintain a smoke free home."
 {¶ 22} Several witnesses compared the relationship between the twins and their foster family with B.H.'s relationship with the twins. B.H.'s caseworker testified that, while the twins knew B.H. and interacted well with her, they were not strongly bonded to her. She further explained that the twins were more bonded with their foster mother, with whom the twins interacted as mother and daughters.
 {¶ 23} Dr. Ezzo testified that, from his brief observation, he concluded the twins were attached to their foster parents, but that the twins were also attached to B.H. However, Dr. Ezzo also stated that the first three months of a child's life are the most important time in forming attachments and bonds with the child's primary caregiver. The twins spent their first three months of life with the foster family. Although the twins were in B.H.'s legal custody for eleven months, the twins continued to have consistent visits with the foster family which lasted days at a time until they were again placed with the foster family in May 2002. Dr. Ezzo testified that disruption of a child's attachments with its current caregivers would not be in the child's best interest, but would be psychologically detrimental to the child.
 {¶ 24} The twins' guardian ad litem noted in her report that the twins "are integrated into their foster family" and that "a strong bond existed between the foster family and the twins." She further noted:
"The twins were placed with this foster family within days of theirbirth in March 2001. They remained with the foster family until June 2001when they were reunified with the mother. The [foster family] continuedto watch the twins for days or weeks at a time until they were againremoved from [B.H.] on or about May 16, 2002. After removal, the twinswere again placed with the [foster family] where they currently remain."
 {¶ 25} The twins' guardian ad litem also noted that B.H. acknowledged that her bonding with the twins had been inhibited by their time in CCDCFS custody. The twins' father also acknowledged a lack of bonding between himself and the twins. The guardian ad litem recommended a continuation of temporary custody for six months and counseling for mother and the children to improve their bond.
 {¶ 26} At the conclusion of the second trial in November 2002, and notwithstanding the recommendation of the guardian ad litem, the court awarded permanent custody of the twins to CCDCFS.
 {¶ 27} B.H. appeals the decisions from both trials in this consolidated appeal.
 Case No. 82258: Weight of the Evidence re: C.H. {¶ 28} In her sole assignment of error raised in Case No. 82258, B.H. argues that the trial court erred in granting permanent custody of C.H. because (1) none of the circumstances set forth in R.C. 2151.414(E) were proven by clear and convincing evidence, and (2) the judgment is against the manifest weight of the evidence.
 {¶ 29} An appellate court must adhere to "every reasonable presumption in favor of the lower court's judgment and finding of facts."In re Brodbeck (1994), 97 Ohio App.3d 652, 659, quoting Gerijo, Inc. v.Fairfield (1994), 70 Ohio St.3d 223, 226, 1994-Ohio-432. Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. FoleyConstr. Co. (1978), 54 Ohio St.2d 279, syllabus. Further, the Ohio Supreme Court has also specifically held that "it is for the trial court to resolve disputes of fact and weigh the testimony and credibility of the witnesses." Bechtol v. Bechtol (1990), 49 Ohio St.3d 21, 23.
 {¶ 30} R.C. 2151.414 provides that a clear and convincing evidence standard must be utilized when determining termination of parental rights. R.C. 2151.414. Clear and convincing evidence is "that measure or degree of proof * * * which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus; In re Hickok, Marion App. Nos. 9-2000-27, 9-2000-28, and 9-2000-29, 2000-Ohio-1766.
 {¶ 31} In deciding whether to permanently divest parents of their custody rights, R.C. 2151.414(B)(1) requires that the trial court apply a two-prong test. The court must first determine by clear and convincing evidence whether such action will serve the best interests of the child. Once a court determines that granting permanent custody to the movant would be in the child's best interest, the court must then consider whether one of the factors in R.C. 2151.414(B)(1)(a)-(d) applies.
 {¶ 32} As relates to this appeal, R.C. 2151.414(B)(1)(d) focuses on whether the child has "been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999." It is undisputed that C.H. had been in the temporary custody of CCDCFS for over twelve months of a consecutive twenty-two month period ending after March 18, 1999. Indeed, C.H. had been in CCDCFS custody for over three years at the conclusion of the trial. Accordingly, we next turn to B.H.'s claim that the trial court's best interest finding is against the manifest weight of the evidence.
 {¶ 33} R.C. 2151.414(D)(1) through (5) sets forth the relevant factors that a court must consider in determining the best interests of the child. These factors include, but are not limited to, the following:
"(1) The interaction and interrelationship of the child with thechild's parents, siblings, relatives, foster caregivers and out-of-homeproviders, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child orthrough the child's guardian ad litem, with due regard for the maturityof the child;
 (3) The custodial history of the child, including whether the child hasbeen in the temporary custody of one or more public children servicesagencies or private child placing agencies for twelve or more months of aconsecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement andwhether * * * [it] can be achieved without a grant of permanent custodyto the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of thissection apply in relation to the parents and child."
 {¶ 34} R.C. 2151.414(D). This court has stated that only one of these enumerated factors needs to be resolved in favor of the award of permanent custody. In re Moore (Aug. 31, 2000), Cuyahoga App. No. 76942, citing, In re Shaeffer Children (1993), 85 Ohio App.3d 683; see, also, Inre M.Z., Cuyahoga App. No. 80799, 2002-Ohio-6634; In Re Legg, Cuyahoga App. Nos. 80542 and 80543, 2002-Ohio-4582.
 {¶ 35} After considering the factors of R.C. 2151.414(D), the trial court found clear and convincing evidence that C.H.'s best interests would be served by awarding permanent custody to CCDCFS. For the following reasons, we find that this determination is supported by the evidence.
 {¶ 36} R.C. 2151.414(D)(1) required the trial court to consider the interaction and interrelationship C.H. had with significant individuals in her life including parents, siblings, relatives, and foster caregivers. Dr. Frank Ezzo, who testified as an expert at trial, stated that C.H.'s primary bond was with her foster family and that she had only a secondary bond with B.H. Dr. Ezzo described C.H.'s attachment to her foster family as a secure, healthy attachment which forms the basis for C.H.'s development of interpersonal relationships throughout her life. Dr. Ezzo described C.H.'s attachment to B.H. as an insecure, ambivalent attachment.
 {¶ 37} Further, C.H. referred to her foster parents as "mommy and daddy" and considered their biological daughter to be her sister. B.H.'s caseworker testified that when she observed B.H. and C.H. together, she noticed that B.H. did not interact with C.H. very much. She also testified that C.H. often became hysterical at the prospect of leaving her foster home to visit with B.H. and expressly stated that she did not want to visit her.
 {¶ 38} C.H.'s guardian ad litem noted in her report that C.H. has a strong bond with her foster parents. Her report stated, in pertinent part:
"[C.H.] has a strong and nurturing relationship with her fosterparents. She has spent the majority of her life in their care even when inthe custody of her mother. She is well integrated into their home anddaily life. [C.H.] has an incredibly strong bond with her younger fostersister * * *. They have been together since [the foster sister] wasborn. * * * On the other hand, I have no evidence of any similar bondbetween [C.H.] and her biological mother."
 {¶ 39} Based on this evidence, we conclude that the trial court did not abuse its discretion in finding that C.H.'s strong bond with her foster family and lack of similar bond with her mother weighed in favor of permanent custody.
 {¶ 40} R.C. 2151.414(D)(2) required the court to consider "the wishes of the child, as expressed directly by the child or through the child's guardian ad litem * * *." In her oral recommendation that the court grant permanent custody, C.H.'s guardian ad litem stated that C.H. expressed a desire to remain with her foster family for "immediate permanency." C.H.'s guardian ad litem also noted in her report that C.H. "has stated unequivocally that she wishes to remain with her foster family." Therefore, the trial court properly concluded that this factor also weighed in favor of permanent custody.
 {¶ 41} R.C. 2151.414(D)(3) required the court to consider the child's custodial history, including whether the child had been in placement for twelve or more months of a consecutive 22-month period. In the instant case, it is undisputed that C.H. had been in temporary custody for over three years. Therefore, the trial court properly considered this factor in favor of permanent custody.
 {¶ 42} R.C. 2151.414(D)(4) required the court to consider the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody. Here, the trial court found that "the child cannot be placed with one of the [child's] parents within a reasonable time or should not be placed with either parent" and "that a grant of permanent custody is in the best interests of the child." The trial court based this conclusion on the fact that although a case plan was developed for the purpose of assisting B.H. in remedying the risks to C.H., B.H. failed to comply with the requirements of the plan. She was referred to five parenting programs, but attended only two. Her caseworker testified that B.H. failed to demonstrate any benefit from the two programs she completed and continued to demonstrate poor judgment in parenting C.H.
 {¶ 43} Further, as part of the case plan, B.H. was referred to Dr. Melody Deogracias, who conducted a psychiatric evaluation and diagnosed B.H. with major depressive disorder with recurrent psychotic features. Dr. Deogracias prescribed medication and recommended counseling for B.H. However, B.H. failed to take her medication and failed to keep her appointments. Although B.H. claimed she did not need the medication, Dr. Deogracias testified that failure to take the medication would cause the depression to recur and to become more difficult to treat.
 {¶ 44} Dr. Frank Ezzo stated that, as a result of her mental illness, B.H. is unable to provide appropriate parenting to her children. He testified that C.H.'s primary bond is with her foster family with whom C.H. has a secure, healthy attachment. He also described C.H.'s attachment to B.H. as an insecure, ambivalent attachment. Dr. Ezzo stated that removing C.H. from her foster family and placing her with B.H. would be damaging to C.H. and would compromise her ability to grow up to be a successful adult. Finally, Dr. Ezzo recommended permanent custody for C.H.
 {¶ 45} C.H.'s guardian ad litem also opined that B.H. lacks "the emotional or mental skills necessary to adequate[ly] parent her own children."
 {¶ 46} C.H.'s foster parents, with whom she had resided for over three years and who she regarded as family, would like to adopt C.H. and provide her a permanent home if permanent custody were granted. This evidence supports the trial court's conclusion that C.H.'s need for a legally secure permanent placement cannot be satisfied by B.H. within a reasonable time.
 {¶ 47} R.C. 2151.414(D)(5) required the court to consider "[w]hether any of the factors in division (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(E)(7) to (11) refer to cases where a parent has been convicted of certain offenses, withheld medical treatment from the child, placed the child at substantial risk of harm, abandoned the child, or had parental rights involuntarily terminated. None of these factors were applicable to the instant case. Nonetheless, because the trial court properly considered the factors listed in R.C. 2151.414(D), and there is evidence to support four out of five factors, we find no abuse of discretion in the court's determining that permanent custody was in C.H.'s best interests.
 {¶ 48} Accordingly, the sole assignment of error presented in case No. 82258 is overruled.
 Case No. 82852: Weight of the Evidence re: the Twins {¶ 49} In her first assignment of error in Case No. 82852, B.H. argues that the trial court erred in granting permanent custody of the twins to CCDCFS because (1) none of the circumstances set forth in R.C.2151.414(E) were proven by clear and convincing evidence, and (2) the judgment is against the manifest weight of the evidence.
 {¶ 50} Reviewing the trial court's application of the two-prong test required by R.C. 2151.414(B)(1), we find that the court's determination that "the children cannot now or in the near future be reunited with the parents" (R.C. 2151.414[B])[a]) and that permanent custody will serve the best interests of the twins, is supported by clear and convincing evidence.
 {¶ 51} In finding, pursuant to R.C. 2151.414(B)(1)(a), that "the children cannot now or in the near future be reunited with the parents," the court made findings relating to at least one of the sixteen factors enumerated in R.C. 2151.414(E).[2] R.C. 2151.414(E) provides, in pertinent part:
"(E) In determining at a hearing held pursuant to division (a) of thissection or for the purposes of division (A)(4) of section 2151.353 [2151.35.3] of the Revised Code whether a child cannot be placed witheither parent within a reasonable period of time or should not be placedwith the parents, the court shall consider all relevant evidence. If thecourt determines by clear and convincing evidence, at a hearing heldpursuant to division (A) of this section for the purposes of division(A)(4) of section 2151.353 [2151.35.3] of the Revised Code that one ormore of the following exist as to each of the child's parents, the courtshall enter a finding that the child cannot be placed with either parentwithin a reasonable time or should not be placed with either parent:
 Following the placement of the child outside the child's home andnotwithstanding reasonable case planning and diligent efforts by theagency to assist the parent to remedy the problems that initially causedthe child to be placed outside the home, the parent has failedcontinuously and repeatedly to substantially remedy the conditionscausing the child to be placed outside the child's home. In determiningwhether the parents have substantially remedied those conditions, thecourt shall consider parental utilization of medical, psychiatric,psychological, and other social and rehabilitative services and materialresources that were made available to the parents for the purpose ofchanging parental conduct to allow them to resume and maintain parentalduties.
 Chronic mental illness, chronic emotional illness, mental retardation,physical disability, or chemical dependency of the parent that is sosevere that it makes the parent unable to provide an adequate permanenthome for the child at the present time and, as anticipated, within oneyear after the court holds the hearing pursuant to division (A) of thissection or for the purposes of division (A)(4) of section 2151.353 [2151.35.3] of the Revised Code.
 The parent has demonstrated a lack of commitment toward the child byfailing to regularly support, visit, or communicate with the child whenable to do so, or by other actions showing an unwillingness to provide anadequate permanent home for the child."
 {¶ 52} The trial regarding the twins' custody presented much of the same evidence presented in C.H.'s case. As in the previous trial, evidence was presented that a case plan was developed for the purpose of assisting B.H. in remedying the risks to the twins. She was referred to five separate parenting programs and attended two but failed to show any benefit from the programs.
 {¶ 53} B.H.'s caseworker testified that B.H. demonstrated poor judgment in parenting the twins. For example, B.H. allowed C.H. and the twins to watch television unsupervised in one room while she engaged in sexual activity with her boyfriend in another room. The caseworker also stated that B.H. smoked in front of the twins, including the time they had RSV, a potentially serious respiratory virus, even though she knew her smoking aggravated their medical condition.
 {¶ 54} The twins' foster mother testified that B.H. had her tongue pierced, got a tattoo, and sent money to her boyfriend in jail even though the twins did not have suitable car seats, shared a crib, and often had no diapers, wipes, medications, or baby food. The foster mother also stated that during a surprise visit, she found the twins covered with dirt and B.H.'s home in disarray with small objects on the floor which posed a choking hazard to the twins.
 {¶ 55} Evidence was also presented that B.H. was referred to Dr. Deogracias, who diagnosed her with major depressive disorder recurrent with psychotic features and that B.H. failed to take her prescribed medication. There was additional evidence that B.H. missed a total of eight scheduled appointments with Dr. Deogracias, and that her case was closed due to her failure to appear for appointments. Because B.H. refused to avail herself of necessary services or to comply with medication recommendations designed to address her mental illness, the trial court properly found that she failed to remedy the risks which led to the twins' removal.
 {¶ 56} The record also supports a finding, pursuant to R.C.2151.414(E)(2), that B.H. suffered from a chronic mental illness that was so severe that it made her unable to provide an adequate permanent home for the twins. Qualified expert witnesses testified that she suffered from severe depression with psychotic features. They stated that B.H. refused to take prescribed medications and continuously failed to attend recommended counseling. Dr. Frank Ezzo testified that B.H. would likely suffer from life-long mental illness and, if she does not take her medications as directed, her depression would recur and result in severe symptoms. Moreover, Dr. Ezzo opined that B.H.'s mental illness made her incapable of providing appropriate parenting for the twins.
 {¶ 57} The evidence in the record also supports a finding, pursuant to R.C. 2151.414(E), that B.H. demonstrated a lack of commitment to the twins. First, her refusal to avail herself of mental health services in an effort to address her mental illness demonstrated a lack of commitment to any effort toward reunification with the twins. There was also evidence that she often placed her own desires before the twins' needs. There was evidence, similar to that presented in the first trial, that B.H. resisted the suggestion that she provide timely and necessary medical treatment for the twins' pneumonia, and that she continued smoking in the home despite her awareness that such behavior aggravated the twins' respiratory condition. Such behavior demonstrated a lack of commitment to her children.
 {¶ 58} Based on the trial court's findings pursuant to R.C.2151.414(E)(1), (2), and (4), the trial court was required by R.C.2151.414(E) to find that the twins cannot and should not be returned to their parents within a reasonable time. In re Glenn (2000),139 Ohio App.3d 105. Accordingly, we find the trial court's finding was proper. Next, we address the court's determination that permanent custody was in the twins' best interests.
 {¶ 59} As previously stated, when the court makes a determination regarding the best interests of the child pursuant to R.C. 2151.414(D), it is required to consider "all relevant factors" including, but not limited to, those listed in R.C. 2151.414(D)(1)-(5).[3] Although the court must consider each of the factors listed in R.C. 2151.414(D) in making its permanent custody determination, "only one of these factors needs to be resolved in favor of the award of permanent custody." SeeMoore, supra.
 {¶ 60} The trial court's finding, pursuant to R.C. 2151.414(D)(1), that the interaction and interrelationship of the twins with significant individuals in their lives including parents, siblings, and foster caregivers weighs in favor of permanent custody, is supported by the weight of the evidence. B.H.'s caseworker testified that, while the twins knew B.H. as their mother and interacted well with her, they were not strongly bonded to her but were strongly bonded to their foster mother, with whom they interacted as daughters. Dr. Ezzo testified that the first three months of a child's life is the most important time for forming attachments with a primary caregiver. The twins spent the first three months of life with their foster family. Moreover, Dr. Ezzo testified that disruption of a child's attachment with its current caregivers would not be in the child's best interest, but would be psychologically detrimental to the child.
 {¶ 61} The twins' guardian ad litem stated in her report that the twins "are integrated into their foster family," and that "a strong bond existed between the foster family and the twins." Further, the guardian ad litem stated in her report:
"The twins were placed with this foster family within days of theirbirth in March 2001. They remained with the foster family until June 2001when they were reunified with their mother. The [foster family] continuedto watch the twins for days or weeks at a time until they were againremoved from [B.H] on or about May 16, 2002. After removal, the twinswere again placed with the [foster family] where they currently remain."
 {¶ 62} The guardian ad litem also noted in her report that the twins had "a strong and nurturing relationship with their foster family" and that B.H. "acknowledges that [her] bond with the twins has been inhibited by their time in CCDCFS custody."
 {¶ 63} Based on this evidence, we find the trial court's determination, pursuant to R.C. 2151.414(D)(1), that the interaction and interrelationship of the twins with significant individuals in their lives including parents, siblings and foster caregivers weighs in favor of permanent custody, is supported by the weight of the evidence.
 {¶ 64} R.C. 2151.414(D)(2) required the trial court to consider the children's wishes as expressed directly or through their guardian ad litem. The twins' guardian ad litem noted in her report that this factor is inapplicable because the twins were only eighteen months old at the time of trial. However, the guardian ad litem recommended that temporary custody be extended another six months. The guardian ad litem admitted on cross-examination that her recommendation was based on her belief that eighteen-month-old children are not as needy of a secure permanent placement as are older children.
 {¶ 65} However, the guardian ad litem's rationale for extending temporary custody was contradicted by the testimony of Dr. Ezzo, who stated that the first three months of a child's life is the most important time for developing attachments with a primary caregiver. As previously stated, Dr. Ezzo testified that disruption of a child's attachment to its current caregivers would not be in the child's best interest, but would be psychologically detrimental to the child.
 {¶ 66} Moreover, during cross-examination, the twins' guardian ad litem admitted she had very little contact with B.H.'s caseworker and could not remember such basic issues as visitation, interaction between B.H. and the twins, case plan requirements, and compliance. Therefore, we find the trial court's decision to follow Dr. Ezzo's recommendation and to disregard the guardian ad litem's recommendation was not an abuse of discretion.
 {¶ 67} R.C. 2151.414(D)(3) required the trial court to consider the twins' custodial history. The twins were in agency custody and with their foster family for nearly half of their lives. During the eleven months that they were reunified with B.H., they spent considerable time with the foster family and maintained that bond. Therefore, again, we find that the trial court's determination that this factor weighed in favor of permanent custody was not an abuse of discretion.
 {¶ 68} Finally, the court's finding, pursuant to R.C. 2151.414(D)(4), that the twins' need for a legally secure placement could not be achieved without a grant of permanent custody, is supported by the weight of the evidence. As previously stated, the court was required by R.C. 2151.414(E) to enter a finding that the twins cannot and should not be placed with either parent within a reasonable time. Glenn, supra. Further, the twins' guardian ad litem admitted that, just one week prior to trial, she stated in a report that B.H. lacked "the emotional or mental skills necessary to adequate[ly] parent her own children." This statement was corroborated by Dr. Ezzo's testimony that B.H.'s history of mental illness made her incapable of providing appropriate parenting. Based on this evidence, the court properly concluded that the twins' need for a legally secure permanent placement cannot be satisfied by placement with B.H. within a reasonable time.
 {¶ 69} Accordingly, the first assignment of error in case No. 82852 is overruled.
 Juv.R. 29 {¶ 70} In her second assignment of error in Case No. 82852, B.H. argues that the trial court committed reversible error by failing to follow the mandates of Juv.R. 29 during the adjudicatory hearing held on August 2, 2002, when B.H. admitted allegations of neglect and dependency. However, this court is without jurisdiction to consider this assignment of error because she failed to file a timely notice of appeal regarding any errors alleged to have occurred at the adjudicatory hearing.
 {¶ 71} An adjudication of dependency is a final appealable order. See In re Murray (1990), 52 Ohio St.3d 155, syllabus; Ackerman v. LucasCty. Children's Services Bd. (1989), 49 Ohio App.3d 14, 16; In re Rule
(1963), 1 Ohio App.2d 57, 60. B.H. had 30 days after the filing of the August 13, 2002 entry to file an appeal. App.R. 4(A). Any issue related to the adjudication of dependency should have been raised at that time. See In re Smith (1982), 7 Ohio App.3d 75, 77.
 {¶ 72} Nevertheless, rather than filing an appeal at that time, B.H. waited until after the court had granted permanent custody of the twins to CCDCFS. An appeal now is timely as to any issues regarding the disposition of the motions for permanent custody. However, this assignment of error alleges error in conducting an adjudicatory hearing which took place three months before the trial on permanent custody. B.H.'s failure to file a timely appeal precludes consideration of this issue. Ackerman, supra, at 16.
 {¶ 73} Accordingly, the second assignment of error is overruled.
 {¶ 74} The judgments are affirmed.
Judgments affirmed.
Kenneth A. Rocco, A.J., and Michael J. Corrigan, J., concur.
It is ordered that appellee recover of appellant the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Juvenile Court Division of the Cuyahoga County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
[1] The record does not clearly reflect what program was offered at Marycrest, but it is undisputed that B.H. successfully completed the program there.
[2] The twins'father has not appealed the trial court's decision.
[3] For reasons previously explained, R.C. 2151.414(D)(5), which deals with "[w]hether any of the factors listed in divisions (E)(7) to (11) of this section apply in relation to the parents and child" is inapplicable to the facts of this case.