[Cite as *In re N.S.*, 2022-Ohio-4088.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE: N.S., JR., ET AL.,          :

                                        No. 111486

Minor Children                  :

[Appeal by O.S., Mother]       :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 17, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD20905427 and AD20905428

---

### *Appearances:*

Matthew O. Williams, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, for *appellee.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Appellant O.S. ("mother") appeals from a judgment of the juvenile court granting permanent custody of her children N.S. and T.S. to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "agency"). Our review reflects that the juvenile court properly engaged in the two-prong analysis

prescribed by R.C. 2151.414 and that clear and convincing evidence supports the court's decision granting permanent custody of the children to the agency. We therefore affirm.

**Background**

{¶ 2} On January 19, 2020, mother and N.S. ("father") engaged in a physical altercation in the family home in the presence of their children. Father was subsequently convicted of domestic violence and attempted felonious assault on June 16, 2020, for the incident and received community control sanctions. The court ordered father to have no contact with mother.

{¶ 3} Despite the no-contact order, however, mother allowed father access to the home. On June 19, 2020, CCDCFS filed a "Complaint for Abuse, Neglect and Temporary Custody to CCDCFS" regarding mother and father's four children: two girls, born in 2010 and 2011, respectively, and two boys, N.S. and T.S., born in 2014 and 2016, respectively.[1] The children were removed from the home that day, pursuant to an ex parte telephone order.

{¶ 4} The complaint, subsequently revised, alleged that "mother and father have engaged in domestic violence when the children were in the home" and mother allowed father access to the home and to the children as recently as June 16, 2020, in violation of the no-contact order imposed as a result of father's domestic-violence conviction.

---

[1] The two girls were ultimately placed in the legal custody of their paternal grandmother and, therefore, are not the subject of the agency's subsequent motion for permanent custody or this appeal.

{¶ 5} In conjunction with the complaint, the agency also filed a motion on June 19, 2020, for predispositional temporary custody. A magistrate held a hearing that day and granted the agency's motion.

{¶ 6} On September 29, 2020, a magistrate held an adjudicatory hearing on the agency's complaint. Kawana Johnson, the social worker on the case, testified at the hearing. Mother stipulated to the allegations of the complaint as amended, and the court adjudicated N.S. and T.S. as abused and neglected.

{¶ 7} After the adjudication, the parties agreed to proceed immediately to disposition and the court granted the agency's motion to incorporate the testimony from the adjudicatory hearing into the dispositional hearing. The next day, the magistrate issued a decision and findings of fact, granting temporary custody to CCDCFS. Mother was found to be engaged in parenting education, substance abuse treatment, and domestic-violence counseling; father, however, needed to complete his domestic-violence counseling and anger-management program, and he was inconsistent with his visits with the children. N.S. was being assessed for speech delay, and T.S. for special needs. On October 19, 2020, the trial court issued a judgment entry adopting the magistrate's decision.

{¶ 8} On June 3, 2021, the trial court granted the agency's motion for an extension of temporary custody, after finding a lack of significant progress made by either parent on their case plan. On June 25. 2021, the agency moved to modify temporary custody to permanent custody.

**Testimony at Permanent-Custody Hearing**

{¶ 9} On March 16, 2022, the trial court held a hearing on the permanent-custody matter. Testifying for CCDCFS were Vanessa Cunningham, a resource specialist with the Friendly Inn Settlement, where mother's and father's visitations with the children took place; Kaitlyn Shipe, who provided services for the children regarding their foster care; and Shamara Leonard, the agency's social worker on the case.

{¶ 10} The testimony reflects that the children were removed from the home on June 19, 2020, due to severe domestic violence and the unsafe living condition of the home. Following the children's removal, a case plan was developed for mother to address issues of parenting, substance abuse, mental health, domestic violence, and housing.

{¶ 11} Mother completed the substance-abuse program and consistently submitted to urine screens, but she appeared to have relapsed on March 3, 2022. On that day, she behaved erratically, calling Leonard ten times after work hours. Mother was crying and screaming and falsely claimed that her children were "in danger." Leonard asked her to submit to alcohol testing, but mother failed to do so.

{¶ 12} Regarding mother's parenting, Cunningham, who knew the family when they previously stayed at Zelma George Shelter, testified that mother would get up early in the morning and prepare the bottles for the two boys before she headed to work. The children were happy with mother. Cunningham considered her a "good mother," based on her observation at the family shelter. She was

"shocked" when she learned in October 2020 that the children had been removed. Cunningham also testified that mother later attended visitations regularly, and she described the visitations as "peaceful."

{¶ 13} Leonard testified that mother would bring snacks, food, and birthday gifts to the visitations. She would play with N.S. and T.S. on the floor or color with them. Leonard, however, testified that mother struggled with parenting N.S. and T.S. When the visitations began, N.S., age five at the time, was still not potty-trained. When mother asked him to use the bathroom, he would start running around and throwing objects, but he would comply if asked by his eldest sister. The younger boy, T.S., would throw objects, pull hair, and scratch when he was upset. On multiple occasions, T.S. pulled mother's hair and scratched her when she put him in the van at the end of the visitations and persisted despite being asked to stop the behavior. Mother failed to engage in the parenting service initially but eventually completed it in September 2021, although she still had difficulties with N.S. during the visits.

{¶ 14} Regarding mental health, mother was initially referred to Recovery Resources but never attended the program. She was later referred to the Jewish Family Association and completed the program there in July 2021. She was then referred to the juvenile-court clinic for a mental-health assessment and found to have severe post-traumatic stress disorder ("PTSD"). The clinic indicated she could benefit from a mental-health provider specializing in domestic violence. She failed to engage in the recommended counseling.

{¶ 15} Regarding domestic violence, Leonard testified that, despite mother's completion of the initial domestic-violence program, she failed to benefit from it. Her behavior or mindset have not changed; she continued to blame herself for the domestic violence and to minimize it. She had indicated that she would stay with father "no matter what" despite Leonard's discussion with her regarding the adverse impact of domestic violence on her children.

{¶ 16} Regarding father, he was observed by the staff at the family shelter to be verbally abusive to mother. He would also "holler" at the boys after mother left for work. Although the shelter's staff did not observe bruises on mother, she had admitted that father was physically abusive to her.

{¶ 17} Father had visitations with the children initially at the Friendly Inn Settlement, but he was banned from the facility just one month later after an incident where he was verbally abusive toward a staff member and threatened to physically assault her. The agency had to change the venue of the visitations to Fatima Center. Cunningham testified that, during the visitations, N.S. and T.S. would not want to stay in the same room with father. T.S. would urinate and act out. While father interacted well with his daughters, N.S. and T.S. did not want to interact with him at all.

{¶ 18} Father was convicted of domestic violence and attempted felonious assault for the domestic-violence incident in January 2020, which ultimately led to the children's removal from the home. The testimony at the hearing revealed that

this is not father's only criminal conviction; he had been convicted in 1992 of voluntary manslaughter with a firearm specification.

{¶ 19} Both mother and father minimized domestic violence in the family. In the January 2020 incident, the police arrived in the home to find mother unconscious. When Leonard asked father about the incident, father claimed mother was cooking in the kitchen and hit her head and fell, and mother agreed with father's version of the event.

{¶ 20} Leonard testified that both of the couple's daughters had been diagnosed with PTSD. The younger girl's doctor noted that she suffered severe PTSD from "constantly witnessing domestic violence." Mother, however, denied the girls ever witnessed any domestic violence.

{¶ 21} Despite the no-contact court order as part of father's community control sanctions, the social worker believed mother remained with father. On one occasion when Leonard visited the home, the social worker saw father's belongings in a closet and mother stated that "when we get the kids back, we plan to move to Florida."

{¶ 22} Regarding N.S. and T.S., Shipe testified that both were yet to be potty-trained when the agency took custody of them. They were scared to go in the bathroom and would be crying and screaming when asked to do so, but the foster family was able to get them potty-trained. N.S. was diagnosed with autism and received speech, physical, and occupational therapy. Shipe testified that N.S. has developed a close relationship with his foster family and was often seen giving them

hugs. T.S. exhibited aggressive behaviors: he would hit, kick, bite, pull hair when angry, and once scratched his teacher at school. The foster family was able to use timeouts to address T.S.'s aggressive behaviors. Shipe also observed the brothers to be very close to each other. While the legal custody of the couple's daughters was eventually placed with their paternal grandmother, the agency was unable to find a relative placement for N.S. and T.S.

{¶ 23} The social worker testified that the agency believes it is in the best interest of the children for the agency to be granted permanent custody, because mother continued to minimize domestic violence in the family while maintaining constant contact with father.

{¶ 24} After the testimony presented by the agency, the children's guardian ad litem ("GAL") made a recommendation for permanent custody. He considered father "dangerous" and noted that multiple family members suffered PTSD as a result of father's abuse of mother, yet mother remained in contact with father and had asked the court to lift the no-contact order to enable her to tend to father's health issues. The GAL also noted that mother appeared to have relapsed, most likely due to father's abusive behaviors. The GAL opined that, despite mother's positive relationship with her children, she has no ability to protect them.

{¶ 25} On appeal, mother raises the following two assignments of error for our review:

> I. The trial court abused its discretion committing reversible error when it failed to dismiss the CCDCFS's complaint having failed to hold a dispositional hearing within the time allowed law.

II. The trial court's termination of appellant's parental rights is against the manifest weight of the evidence.

**Time Limitation for Permanent-Custody Hearing**

{¶ 26} Under the first assignment of error, mother argues that the hearing on the agency's motion for permanent custody, filed on June 25, 2021, must take place by October 18, 2021, citing R.C. 2151.35 (B)(1).

{¶ 27} R.C. 2151.35(B)(1) governs the procedure after a child is adjudicated as abused, neglected, or dependent. It states that "[i]f the court at an adjudicatory hearing determines that a child is an abused, neglected, or dependent child, the court shall not issue a dispositional order until after the court holds a separate dispositional hearing." The statute further permits the court to hold the dispositional hearing "immediately after the adjudicatory hearing if all parties were served prior to the adjudicatory hearing with all documents required for the dispositional hearing." Finally, the statute provides that the dispositional hearing must be held within 90 days after the complaint is filed, but the deadline may be extended by the court on its own motion or on the motion of any party, for good cause shown, for 45 days. If the dispositional hearing is not held within the time limit, the statute provides that the court shall, on its own motion or the motion of any party, dismiss the complaint without prejudice.

{¶ 28} Here, by the parties' agreement, a separate dispositional hearing was held on September 29, 2020, immediately after the children were adjudicated as

abused and neglected.  It was held beyond the 90-day time limit but within the 45-day extension.

{¶ 29} On appeal, mother does not claim that the September 29, 2020 dispositional hearing was not held timely pursuant to R.C. 2151.35(B)(1).  Rather, citing Juv.R. 34(G), she claims the hearing on the agency's motion is a "dispositional hearing" and, as such, must be held within 135 days of the motion for permanent custody filed on June 21, 2021, and, therefore untimely pursuant to R.C. 2151.35(B)(1).  Mother's claim in reliance of R.C. 2151.35(B)(1) and Juv.R. 34(G) lacks merit.

{¶ 30} Juv.R. 34 governs dispositional hearings in juvenile court. Juv.R. 34(G) concerns modification of temporary order.  It states:

> The department of human services or any other public or private agency or any party * * * may at any time file a motion requesting that the court modify or terminate any order of disposition.  The court shall hold a hearing upon the motion as if the hearing were the original dispositional hearing and shall give all parties and the guardian ad litem notice of the hearing pursuant to these rules.

{¶ 31} Citing R.C. 2151.35(B)(1) and the provision in Juv.R. 34(G) stating "[t]he trial court shall hold a hearing upon the motion as if the hearing were the original dispositional hearing," mother argues that because the motion for permanent custody is to be treated as the "original dispositional hearing," the 135-day time limit in R.C. 2151.25(B)(1), applicable for the post-adjudicatory disposition, should be applied to the motion for permanent custody as well.

{¶ 32} While mother asks us to apply the 135-day time limitation to a hearing on a motion for permanent custody based on the cited language in Juv.R. 34(G), we note that R.C. 2151.414 specifically governs the hearing on a motion for permanent custody: R.C. 2151.414(A)(2) provides that the hearing shall be held no later than 120 days after the agency files the motion for permanent custody, but the court may continue the hearing "for a reasonable period of time" beyond the 120-day deadline "for good cause shown."

{¶ 33} Despite the time limitation, however, R.C. 2151.414(A)(2) expressly states that the trial court's failure to comply with the time period "does not affect the authority of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court." Because of this expressive language, this court has determined that the time limitation language in R.C. 2151.414(A)(2) is "directory" rather than mandatory — the language exists "for the assurance of the prompt resolution of child custody matters," rather than as a jurisdictional perquisite. *In re M.W.*, 8th Dist. Cuyahoga Nos. 98214 and 98215, 2012-Ohio-5075, ¶ 21. *See also In re B.F.*, 3d Dist. Marion Nos. 9-19-77 and 9-19-78, 2020-Ohio-3086, ¶ 6, citing *In re M.C.*, 4th Dist. Scioto No. 16CA3755, 2016-Ohio-8294, ¶ 14 ("Based on this express language, courts * * * have held that these time periods are not jurisdictional and that noncompliance with them do not warrant reversal or dismissal of a permanent custody award"); *In re M.W.*, 9th Dist. Wayne No. 08CA0020, 2008-Ohio-4499, ¶ 24; and *In re B.L.*, 10th Dist. Franklin No. 04AP-1108, 2005-Ohio-1151, ¶ 8.

{¶ 34} This court in addition stated in *M.W*, 2012-Ohio-5071, that the remedy for a party aggrieved by a trial judge's delay is to petition an appellate court for a writ of procedendo to compel the execution of the judge's duty and, furthermore, a failure to do so at the trial court constitutes a waiver for purposes of appeal. *Id.* at ¶ 22. *See also In re J.D.*, 8th Dist. Cuyahoga No. 111039, 2022-Ohio-2677, ¶ 12 (because the time provisions in R.C. 2151.414(A)(2) are directory only, a litigant must seek a writ of procedendo against the juvenile court if it fails to comply with the time limitation). A claim of delay predicated on the directory time provision contained in R.C. 2151.414(A)(2) lacks merit where the issue is not raised before the trial court and no demonstration is made on appeal how the delay operated to prejudice a party's rights. *In re B.F.* at ¶ 9, citing *In re J.A.*, 3d Dist. Defiance Nos. 4-16-18, 4-16-19, and 4-16-20, 2017-Ohio-997, ¶ 33; *In re M.G.*, 5th Dist. Perry No. 16CA18, 2016-Ohio-5256, ¶ 37; *In re James*, 10th Dist. Franklin No. 03AP-373, 2003-Ohio-5208, ¶ 39; and *In re Allbery*, 4th Dist. Hocking No. 05CA12, 2005-Ohio-6529, ¶ 29.

{¶ 35} Here, the agency filed the motion for permanent custody on June 25, 2021. The trial court did not hold the hearing until March 16, 2022, past the 180-day deadline. The delay, however, does not require a dismissal of the complaint of this case as mother claims. The record does not indicate that mother ever raised the issue before the trial court, and mother has not demonstrated how the delay prejudiced her rights. Accordingly, we overrule the first assignment of error.

**Permanent Custody**

{¶ 36} Under the second assignment of error, mother argues the trial court's decision awarding custody to CCDCFS is against the manifest weight of the evidence. Specifically, she maintains that the testimony presented at the permanent-custody hearing reflects that she is a good mother who cares for her children and the trial court's decision is only based on domestic violence committed by her husband.

{¶ 37} We begin our analysis with the recognition that, while a parent's right to raise a child is an essential and basic civil right, *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), children have the right to "parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation." *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996).

{¶ 38} Under Ohio's permanent custody statute, R.C. 2151.414, the juvenile court's judgment granting permanent custody must be supported by clear and convincing evidence. Clear and convincing evidence has been defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. We will not reverse a juvenile court's termination of parental rights and award of permanent

custody to an agency unless the judgment is not supported by clear and convincing evidence. *See, e.g., In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 48; *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24.

**Two-Prong Analysis for Permanent Custody**

{¶ 39} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. Under the statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the five factors under R.C. 2151.414(B)(1)(a) to (e) exists and, furthermore, permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D)(1).

{¶ 40} Under the first prong of the permanent-custody analysis, the juvenile court is to determine if any of the following factors exists: whether the child is abandoned (R.C. 2151.414(B)(1)(b)); whether the child is orphaned and there are no relatives of the child who are able to take permanent custody (R.C. 2151.414(B)(1)(c)); whether the child has been in the temporary custody of public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)); whether another child of the parent has been adjudicated as abused, neglected, or dependent on three separate occasions (R.C. 2151.414(B)(1)(e)); or, when none of these factors apply, whether "the child cannot be placed with either of the child's parents within a

reasonable time or should not be placed with the child's parents."
(R.C. 2151.414(B)(1)(a)).

{¶ 41} If any of these five factors under R.C. 2151.414(B)(1) exists, the trial court proceeds to analyze the second prong — whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency. R.C. 2151.414(D)(1).

{¶ 42} Here, mother argues the trial court's decision granting permanent custody should be reversed because Cunningham's testimony reflects that she is a good mother and the presence of domestic violence by father does not support a grant of permanent custody to the agency. It is unclear, however, whether she is challenging the trial court's findings under R.C. 2151.414(B)((1) or 2151.414(D). For the sake of completeness, we will review the court's findings under both prongs of the permanent custody analysis.

### a. R.C. 2151.414(B)(1)

{¶ 43} Here, under the first prong of the permanent-custody analysis, the trial court found the presence of the R.C. 2151.414(B)(1)(a) factor — that the children cannot be placed with either mother or father within a reasonable time or should not be placed with either parent. For this finding, R.C. 2151.414(E) enumerates 15 factors for the trial court to consider. In this case, the trial court found the presence of (E)(1) and (E)(4) factors. R.C. 2151.414(E) states, in relevant part:

> (E) In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court

determines, by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

{¶ 44} Regarding (E)(1), while mother completed a parenting program and some mental-health services, we note that "'[t]he issue is not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal.'" *In re J.B.*, 8th Dist. Cuyahoga Nos. 98566 and 98567, 2013-Ohio-1706, ¶ 139, quoting *In re McKenzie*, 9th Dist. Wayne No. 95CA0015, 1995 Ohio App. LEXIS 4618,11 (Oct. 18, 1995).

{¶ 45} Our review of the testimony indicates mother failed to substantially remedy the condition causing the children's removal despite the agency's assistance. The children were removed due to domestic violence in the home in the presence of

the children. The agency referred mother to domestic-violence services. Mother initially did not engage in the services, but later completed a program in July 2021. However, she failed to engage in any further mental-health program regarding domestic violence to address her diagnosis of severe PTSD, and she did not appear to benefit from the domestic-violence program she completed. She continued to blame herself for domestic violence and to minimize it, and also failed to appreciate the adverse impact of domestic violence on her children. Despite the no-contact order, the agency found that she remained with father, and she indicated she would always choose to stay with father. The GAL testified at the hearing that, despite mother's desire to keep her children, she has no ability to protect the children.

{¶ 46} Regarding (E)(4), while mother has taken some steps to address her mental health and substance abuse, our review of the testimony indicates mother has demonstrated a lack of commitment toward the children by her actions: she failed to submit to alcohol testing since a relapse in March 2022; did not engage in further counseling to address domestic violence in the home; continued to have contact with father despite the no-contact order; and has indicated her desire to stay with father.

{¶ 47} Pursuant to R.C. 2151.414(E), if the court determines, by clear and convincing evidence, that one or more of the (E)(1)-(15) factors exist, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *See e.g.*, *In re I.R.*, 8th Dist. Cuyahoga No. 110410, 2021-Ohio-3103, ¶ 69 (based on its findings under

R.C. 2151.414(E), the juvenile court was required to find that the child could not be placed with either of his parents within a reasonable time or should not be placed with either parent), citing *In re C.H.*, 8th Dist. Cuyahoga Nos. 82258 and 82852, 2003-Ohio-6854, ¶ 58. Because our review reflects clear and convincing evidence relating to the (E)(1) and (E)(4) factors, the trial court properly found that N.S. and T.S. cannot be placed with either parent within a reasonable time or should not be placed with either parent.

### b. Best Interest of the Child

{¶ 48} Once the juvenile court determines that one of the five factors listed in R.C. 2151.414(B)(1) is present, the court proceeds to an analysis of the child's best interest. The juvenile court is to undertake this analysis with the recognition that, although parents have a constitutionally protected interest in raising their children, that interest is not absolute and is always subject to the ultimate welfare of the child. *In re B.L.*, 10th Dist. Franklin No. 04AP-1108, 2005-Ohio-1151, at ¶ 7; and *In re N.M.*, 8th Dist. Cuyahoga No. 106131, 2018-Ohio-1100.

{¶ 49} In determining the best interest of the child, R.C. 2151.414(D) mandates that the juvenile court consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 50} When analyzing the best interest of the child, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Furthermore, although family unity and blood relationship are vital factors to be carefully considered, the paramount consideration is the best interest of the child. *In re J.B.*, 8th Dist. Cuyahoga Nos. 98566 and 98567, 2013-Ohio-1706, at ¶ 163.

{¶ 51} Here, the trial found permanent custody to be in the children's best interest after its consideration of (a) the interaction and interrelationship with their parents, siblings, relatives, and foster parents, (b) the wishes of the children; (c) the children's custodial history, (d) the children's need for a legally secure permanent placement, and the report of the GAL. Our review of the record supports the court's determination.

{¶ 52} Regarding the (D)(1)(a) factor, although mother interacted positively with the children, such as playing with them during visitations, she had difficulties controlling their behaviors. As this court has recognized, the best interest of the

child requires permanency and a safe, secure environment, and the mere existence of a good relationship is insufficient. *In re K.M.*, 8th Dist. Cuyahoga No. 95374, 2011-Ohio-349, ¶ 23. Regarding the foster family, the children were observed to be close to their foster family and close to each other. They have made significant progress in their behaviors while under the foster family's care.

{¶ 53} Regarding the (D)(1)(b) factor, the children, seven and five at the time of the permanent-custody hearing, were not sufficiently verbal to express their wishes. Where the children are too young to express their wishes, it is proper for the juvenile court to consider the GAL's recommendation as part of the (D)(1)(b) analysis. *In re M.D.*, 8th Dist. Cuyahoga Nos. 110957, 110958, and 110959, 2022-Ohio-2672, ¶ 35. Here, the GAL recommended permanent custody based on his concerns about mother's ability to provide a safe home for the children.

{¶ 54} Regarding the (D)(1)(c) and (d) factors, the children were removed in June 2020 and remained in the custody of CCDCFS since then. By the time of the trial in March 2022, they have been in the agency's custody for over 20 months. The evidence also reflects the children's need for a legally secure permanent placement: mother is unable to provide a safe home for the children due to her desire to stay with father despite domestic violence in the home, and no relative placement was available.[2]

---

[2] Mother argues that "domestic violence concerns alone, and in the face of otherwise positive parenting assessments [and] case plan progress, cannot provide the sort of clearly convincing evidence necessary to terminate a parent's rights," citing *In re M.S.*, 2015-Ohio-1847, 34 N.E.3d 420 (8th Dist.). Our review of *M.S.* indicates that the case, while also involving domestic violence between the children's parents, contains highly

{¶ 55} Our review therefore reflects the evidence before the trial court clearly and convincingly demonstrated that permanent custody to the agency is in the best interest of N.S. and T.S. pursuant to the R.C. 2151.414(D)(1) factors. Accordingly, the court's judgment granting permanent custody to CCDCFS is affirmed.

{¶ 56} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

---

distinguishable facts. There, father appealed from the trial court's judgment granting permanent custody. In analyzing the best interest of the children, this court found the factors under R.C. 2151.414(D)(1)(a) and (b) clearly weighed in favor of preserving the family relationship despite domestic-violence issues: the children had a strong, loving relationship with appellant; he had constant visitations with the children; there were no concerns regarding his interactions with them; and the children had expressed a desire to be with him. Regarding the (D)(1)(d) factor, this court noted that father had taken significant steps toward completing the case plan and remedying the conditions which had caused the children's removal and, at one point, appellant came very close to reunification with his children. The evidence also showed father consistently followed up with services, obtained schooling and daycare for the children, and took care of the children and their needs. Consequently, this court found no clear and convincing evidence existed to show that a legally secure permanent placement cannot be achieved without a grant of permanent custody. While *M.S.* also involved domestic violence, this court's decision was predicated on the specific facts present in that case and it does not support a reversal here.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
FRANK DANIEL CELEBREZZE, III, P.J., CONCURS (WITH SEPARATE CONCURRING OPINION ATTACHED)


FRANK DANIEL CELEBREZZE, III, J., CONCURRING:

{¶ 57} I concur with the majority's opinion and resolution of this matter. Custody decisions are undoubtedly the most challenging and most important decisions we make as judges. I respectfully write separately to emphasize the gravity of protecting the children, and my hope that Mother will extricate herself from the violence and the abuse.

{¶ 58} As an appellate jurist with more than 20 years of experience, a father, and a grandfather, I am extremely concerned about the domestic violence inflicted against Mother and the fact that such abuse was witnessed by the children in this matter. During my time as a judge, my top priority has been protecting children, women, and those who cannot protect themselves. This is our duty as jurists, and it will continue to be my top priority as long as I am on the bench.

{¶ 59} In the instant matter, Mother has been given ample time to make progress on her case plan, alleviate the concerns that caused the removal of the children from her custody, and demonstrate that she is willing and able to provide a

safe, stable, and permanent home for these children.  Unfortunately, Mother has failed to take advantage of these opportunities.  The record reflects that Mother minimized the domestic violence in the home and blamed herself for it.  While this is common behavior for victims of domestic violence, the children must still be protected.  As noted by the GAL, it is clear that Mother does not have the ability to protect the children.  Mother has stated to the agency that she has no intention to leave Father and that she would pick him over the children.

{¶ 60} In my view, Mother should reflect upon the totality of the horrific circumstances in this case.  It is critical that Mother understands and appreciates that she is risking her own safety and well-being by continuing to associate with an individual that has inflicted such abuse on her.  When considering the history of this case and the pattern of abuse, I am reminded of a song by The Red Jumpsuit Apparatus — "Face Down."  My greatest hope for Mother is that, like the woman in the song, she has finally reached the point where she has "had enough."  The vicious cycle has gone on for too long, and it is imperative that Mother break the cycle to save herself.