[Cite as *In re I.R.*, 2021-Ohio-3103.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE I.R.

A Minor Child

[Appeal by Father, A.W.]

:
:
:
:
:

No. 110410

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 9, 2021

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD20910278

***Appearances:***

Matthew O. Williams, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young and Zachary J. Lafleur,
Assistant Prosecuting Attorneys, *for appellee*.

EILEEN A. GALLAGHER, J.:

{¶ 1} Appellant-father A.W. ("Father") appeals from the decision of the Juvenile Division of the Cuyahoga County Court of Common Pleas ("the juvenile court") terminating his parental rights and granting permanent custody of his minor son, I.R., to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). For the reasons that follow, we affirm.

**Factual Background and Procedural History**

{¶ 2} I.R. was born on August 22, 2017. His mother, A.R. ("Mother") had two other children — a daughter and a son. Approximately six days after his birth, I.R. was removed from Mother's custody, was committed to the custody of CCDCFS and was placed in a foster home with his siblings. I.R. remained in the foster home until March 2020. On March 4, 2020, the juvenile court granted Father legal custody of I.R.

{¶ 3} In late August 2020, CCDCFS received a report that I.R. may have been abused. The agency investigated the report and, on September 1, 2020, it filed a complaint for abuse, dependency and permanent custody and a motion for predispositional temporary custody in the juvenile court (Cuyahoga C.P. Juv. No. AD20907424). The complaint alleged that on or about August 31, 2020, I.R. was "observed with various bruises around his neck," that Father "uses excessive and inappropriate physical discipline with the child" and that Father "has mental health issues and anger management problems which prevent him from providing a safe and adequate home for the child." The complaint also alleged that I.R. had been previously adjudicated abused and dependent in Cuyahoga C.P. Juv. No. AD18902334 and that he had been in the custody of the agency from August 28, 2017 until March 4, 2020. With respect to Mother, the complaint further alleged that Mother had failed to communicate with I.R. since birth, that she had mental health and anger management issues that prevented her from providing a safe and adequate home for I.R. and that she had two other children who had been

committed to the permanent custody of CCDCFS due, in part, to Mother's mental health and anger management issues.

{¶ 4} Following a hearing, the juvenile court committed I.R. to the emergency custody of CCDCFS. I.R. was then placed with the foster family with whom his two siblings were then living and with whom he had been placed when he was previously in agency custody.

{¶ 5} CCDCFS submitted a case plan that required Father to attend parenting classes with a focus on age-appropriate discipline and interactions and to undergo a mental health assessment and comply with any recommended mental services.

{¶ 6} In early December 2020, the juvenile court dismissed the complaint because it was not resolved within the statutory time frame. The agency refiled the complaint, along with another motion for predispositional custody, on December 7, 2020.

**Emergency Custody Hearing**

{¶ 7} On December 8, 2020, the juvenile court held a second emergency custody hearing. CCDCFS supervisor, Kesha Sing, testified at the hearing. Sing indicated that the case was initiated in late August 2020 after the agency received a report that Father was using excessive discipline that resulted in "marks and bruises" on I.R. Short-term CCDCFS social worker, Kawana Johnson, whom Sing supervised, went to Father's house to investigate. Sing stated that when Johnson arrived at Father's home, Father told Johnson I.R. was not at home, but that, shortly

thereafter, a third party contacted Johnson and told her that I.R. had, in fact, been in Father's home at the time of Johnson's visit. Sing testified that she instructed Johnson to go back to the home immediately with police. Sing stated that when Johnson returned to the home, I.R. was observed with marks and bruises. Sing testified that Father then admitted using inappropriate discipline with I.R., that Father had stated that he believed his "discipline technique" may have been attributable to own unaddressed childhood trauma and that Father had "expressed remorse" for his actions. Sing indicated that I.R. had previously been in agency custody with his siblings "due to mom having some ongoing issues that she couldn't remedy." Sing stated that Mother's current whereabouts were unknown.

{¶ 8} Sing testified that when I.R. was previously in agency custody, Father had worked with the Father's of Initiative program, had completed a parenting program and had engaged in (but not completed) a substance abuse program. Sing indicated that the agency's concerns in the current case related to parenting, excessive discipline, poor judgment, unaddressed trauma and Father's housing situation. Sing stated that at the time of the incident, Father was living with a girlfriend and that the girlfriend had recently informed Father he could not continue to live there.

{¶ 9} Sing testified that she did not believe, at that time, that I.R. would be safe in Father's care because Father had not demonstrated that he had sufficient skills to "deal with the behavior of an average three-year-old child." She stated that she believed that Father's use of inappropriate discipline with I.R. was "chronic"

based on information obtained during collateral contact with other members of the household, a direct account from I.R., who was very articulate, and Father's admission at a team determination meeting that he used discipline "often" with I.R. and that that was "his way of responding to [I.R.] at times."

{¶ 10} Sing testified that I.R. did not require hospitalization and that he was examined by medical professionals following the incident and found to have eczema. Sing indicated that I.R. was "[e]xtremely comfortable" in the foster home with his siblings.

{¶ 11} Following the hearing, the juvenile court, once again, committed I.R. to the emergency custody of CCDCFS and again placed I.R. with the same foster family with whom his two siblings were living.

{¶ 12} On February 19, 2021, the agency conducted a semiannual administrative review ("SAR"). A copy of the SAR report was filed with the court on March 2, 2021. According to the SAR report, Father participated in the SAR via telephone. The SAR report indicates, with respect to Father:

> [Father] is currently attending Nurturing Parenting classes through Ohio Guidestone and reports that he has attended two individual classes and 1 group session. He reports that his second group session is tomorrow and it is virtual. He was requested to complete a mental health assessment through juvenile court and has missed two scheduled appointments. He reports that he plans on calling on Monday morning to reschedule. He has also been referred to the Fatherhood Initiative and he states that he left a voicemail message yesterday and is awaiting a return call. Currently, the visitation is biweekly and virtual for [Father], however [I.R.] is currently not wanting to have visits with his father. Agency staff continue to bring visitation up to [I.R.] during visits and will assess his comfort level going forward. Father reports a desire to see or speak with his son.

**{¶ 13}** The "Concern Review" portion of the report indicates that Father had made "[s]ome [p]rogress" towards addressing the issues that impacted Father's ability to parent and support I.R. but that the "risk level" was "high" or "moderate," at least in part, because Father "has not admitted what happened" to I.R.:

> Dad has been engaged in [p]arenting education. There have been positive reports from his parenting coach[;] as of now this [worker of record] has not seen him interact with [I.R.] to monitor progress towards behavior changes.
>
> * * *
>
> At this time it will be in the best interest of [I.R.] that the agency remain involved and he remain in care. [Father] has not completed case services nor shown the desired behavioral changes to ensure [I.R.'s] safety if he were to return home. At this time the risk level is high and dad has not admitted what happened to [I.R.] The agency has filed for permanency and [I.R.'s] foster mother wants to adopt him. Foster mother has care[d] for [I.R.] since he was born until he was 3 when [Father] was given custody of him. Foster mom is also the adoptive parent to [I.R.'s] two older siblings. At this time the risk level is moderate but dad has not admitted what happened that day.[1]

**Adjudicatory Hearing**

**{¶ 14}** An adjudicatory hearing was held on March 3, 2021. At the outset of the hearing, Father's counsel made an oral motion to compel the production of certain activity log notes the agency had failed to produce in discovery. CCDCFS acknowledged that it did not produce "investigative notes" by Johnson, i.e., notes that contain information about referents and interviews with family members,

---

[1] Although the SAR report indicates that the agency had "filed for permanency" with hearing dates in March 2021, it also states as its "[c]urrent [p]ermanency [g]oal," "[p]ermanent [p]lacement with [r]elative" and identifies August 19, 2021 as the "estimated date to achieve the updated permanency goal."

arguing that such records are "confidential" under Ohio law. The agency indicated that, in connection with its document production one month earlier, it had advised Father's counsel that the investigative notes would not be disclosed. The agency stated that although Father could have filed a motion to compel and requested that the court conduct an in camera review of the documents that had been withheld, Father did not raise the issue until the night before the hearing and that, to the extent the notes contained information related to Father, Father had access to that information from other sources.

{¶ 15} Father's counsel acknowledged that he had information regarding the allegations against him from other sources, including police reports, but claimed that the notes were necessary for impeachment purposes in the event that Johnson had a note "that's different from what her testimony might be about what [Father] said." The juvenile court denied the motion. Father's counsel then moved to preclude Johnson from testifying at the hearing "about anything that occurred" during the time period covered by the notes that had not been produced. Once again, the juvenile court denied the motion.

{¶ 16} Johnson and Lelonna Ferguson, an extended-term social worker for CCDCFS, testified on behalf of CCDCFS at the adjudicatory hearing. Johnson testified that in late August 2020, she went to Father's home, which he shared with his girlfriend and her children in Euclid, Ohio, after the agency received a referral alleging physical abuse of I.R. She stated that when she arrived at the home, Father told her that I.R. was with his paternal aunt and that he had been with her the

previous day, too. Father denied any physical abuse of I.R. but stated that I.R. had scratches on his cheeks and neck due to "bad eczema." Father also volunteered that I.R. would have scratches on his neck because he had recently grabbed I.R. by the back of his hoodie, "where the zipper or something scratched him," to prevent him from being hit by a car when I.R. ran into the street when he and Father were walking to the store.

{¶ 17} Johnson stated that she conducted a walk-through of the home, checking every room except for the adults' bedroom. Father's girlfriend was also at home during Johnson's visit. Johnson asked to see her. Johnson testified that Father opened the door to the bedroom and the girlfriend, who was "not fully dressed," briefly stepped halfway out of the room into the hallway. Johnson could not see into the bedroom and did not hear anything that would suggest that there was a child in the adults' bedroom. Johnson stated that she told Father she needed to see I.R. that day. Father told Johnson that I.R.'s paternal aunt was scheduled to bring I.R. back between 6:00 p.m. and 7:00 p.m. that evening.

{¶ 18} Johnson testified that although Father told her I.R. was not at home during her visit, she later learned that I.R. had been there the entire time. After receiving a call from a referent advising her that I.R. had been at home with Father during the visit, Johnson called I.R.'s paternal aunt. The aunt confirmed that I.R. had not been in her care that day or the previous day. After making several unsuccessful attempts to reach Father by phone, Johnson stated that she felt "uneasy," "like something was going on" because "dad wasn't being truthful," so she

went to the Euclid police station and requested assistance in conducting a second face-to-face visit with Father.

{¶ 19} When Johnson returned to Father's residence with the police, Father answered the door and stated that I.R. had just arrived home. Johnson told Father that she needed to see I.R. Father went upstairs to get him. After several minutes, Father came back downstairs with I.R.

{¶ 20} Johnson testified that I.R. immediately ran towards her. Johnson picked I.R. up and placed him on the dining room table so that she could examine him. Johnson testified that she saw several marks, i.e., bruises and some scratches on both sides of his neck and the middle of his throat, and that she took several photographs of I.R. Johnson stated that she did not see anything that, in her opinion, would have been caused by a zipper. Johnson stated that I.R. made several statements to her that were "alarming" and that she decided to immediately remove I.R. from the home.

{¶ 21} Johnson testified that she confronted Father with the statements I.R. had made and that Father was initially "irate" and denied any abuse, stating that he had told her "how this happened" and that I.R. "would have these marks." She stated that after confronting Father with pictures the agency had received from a referent that showed I.R. with "a busted lip and marks on his face," Father calmed down, "kind of just [went] with whatever was happening at that time" and said he has "anger management issues" and "sometimes he disciplines in a way that is

inappropriate."[2]  Johnson testified that Father was "upset" and crying when he learned I.R. was going to be removed from his custody but ultimately complied and gathered up I.R.'s belongings.  Johnson indicated that Father was charged with child endangering as a result of the incident.

{¶ 22} Johnson testified that I.R. had been in foster care since he was "roughly six days old" until March 2020.  Johnson stated that, at that time, the agency had recommended that I.R. remain in the foster home, where he was living with his two older siblings who had been previously committed to the permanent custody of CCDCFS but that the juvenile court had, instead, granted Father legal custody of I.R.

{¶ 23} Ferguson testified that she was the case worker assigned to I.R.'s case after Johnson.  She stated that I.R. initially came into agency custody in 2017 due to Mother's drug use and undiagnosed mental health issues.  Ferguson indicated that Mother had had no consistent involvement with I.R. during the initial time I.R. was in agency custody and that the agency has had no communication with Mother since late August or early September 2020.

{¶ 24} Father presented no witnesses.  After the parties rested, Father's counsel requested that the allegations that Father has mental health issues be stricken from the complaint because no evidence was presented to support those allegations.  The juvenile court agreed, stating: "[T]here wasn't any evidence

---

[2] The juvenile court admitted photographs Johnson had taken of I.R. but excluded from evidence photographs others had allegedly taken of I.R.'s injuries.

submitted suggesting that the father has mental health issues, but an admission by dad's statement to the social worker that he has anger management problems, so the Court will strike the mental health issues and indicate that there's been clear and convincing evidence suggesting the anger management problems with dad are preventing him from providing a safe and adequate home for the child."  The juvenile court further stated that Father's claim that a zipper from his hoodie cut I.R. when Father tried to prevent him from running into the street did not make "any sense" and that the agency had proven that Father had used excessive and inappropriate physical discipline with I.R.  The juvenile court found that the agency had met its burden of proof by clear and convincing evidence and I.R. was adjudicated to be an abused and dependent child.

**Dispositional Hearing**

{¶ 25} On March 4, 2021, the case proceeded to disposition.  Johnson, Ferguson and T.J., I.R.'s foster mother ("Foster Mother"), testified on behalf of CCDCFS at the dispositional hearing.  At the time of the dispositional hearing, I.R. was three-and-one-half years old.

{¶ 26} Johnson testified that after I.R. was taken into agency custody in September 2020, he spent one night at a foster home in Parma then was transferred to his current foster home, where I.R. had been previously placed, and where I.R. was currently residing with his two older siblings.  Johnson stated that when I.R. arrived at the foster home, "it was just a glow and a delight like never seen before in a three-year-old child."  Johnson stated that I.R. "ran and hugged everyone" and

that he and his brother "literally tumbled over and hit the floor in laughter," "[s]o excited to see each other." Johnson testified that, to her knowledge, I.R. had not had any physical interaction or communication with Foster Mother or his siblings after he was placed in Father's custody in March 2020.

{¶ 27} Johnson stated that she continued handling the case for approximately three months after the agency took custody of I.R. She stated that, during this time, Father was having "some phone issues" "on and off" and that she would lose contact with Father for a time and then Father would be back in contact, stating that his phone was "up and running again."

{¶ 28} Johnson stated that, during the time she was handling the case, I.R. and Father had one "face-to-face visit." She indicated that that it took 30 to 45 minutes before she and I.R. left the foster home for the visit because I.R. "would not calm down" and did not want to visit Father. Johnson testified that when they arrived at the Jane Edna Hunter Building for the visit, I.R. was "uncomfortable," "very nervous" and "[w]ouldn't take his eyes off [Johnson]." Johnson stated that the visit was scheduled for two hours but that it only lasted a little over an hour because Father stated that he needed to leave early. Johnson indicated that Father's behavior was appropriate during the visit.

{¶ 29} Johnson stated that due to the pandemic, CCDCFS had difficulty locating places to conduct in-person visits, so the agency scheduled virtual, telephone "visits." Johnson testified that Father was made aware that virtual visits were an option but that Father "wasn't available" for those types of visits. She

explained that due to Father's phone issues, she "wasn't always able" to contact Father by phone, so she "could never set up anything solid." She stated that she did set up one visit by phone with Father in December 2020, but that I.R. did not want to engage.

{¶ 30} Ferguson testified that she was assigned to I.R.'s case in mid-to-late November 2020 and that she immediately reached out to Father, Mother and Foster Mother. She stated that she was able to make contact with Father and Foster Mother, but that Mother never returned her calls.

{¶ 31} Ferguson testified that the agency's case plan included counseling for I.R. and parenting classes and mental health services for Father. Ferguson related that I.R. began attending virtual counseling sessions at Ohio Guidestone in January 2021.

{¶ 32} With respect to the case plan services for Father, Ferguson stated that a referral was made for parenting classes, so Father could "develop better parenting techniques" and that mental health services were part of the case plan because Father had stated that he had "untreated trauma from when he was little" that "he kind of thinks is affecting him now."

{¶ 33} Ferguson testified that that Father had begun attending a nine-week telephonic parenting program at the end of January 2021 and that, as of the date of the hearing, Father had attended "[l]ike three or four classes." Ferguson stated that she had tried to get Father engaged in parenting classes earlier but that Father was, at one point, in the hospital and, at another point, had issues with his phone such

that Ferguson could not get in contact with him. Ferguson indicated that a referral had been made for Father to attend parenting classes during the prior period in which the agency had custody of I.R. but that Father did not complete them.

{¶ 34} With respect to mental health services, Ferguson testified that a mental health assessment was scheduled for December 30, 2020 at the Juvenile Court Diagnostic Clinic, but that Father did not appear for the assessment. Ferguson did not know why Father did not attend the assessment. Ferguson stated that, to her knowledge, mental health services were not part of the case plan for Father in the prior case.

{¶ 35} Ferguson stated that Father is employed and lives with his godmother, that the home is appropriate and that there is adequate space there for I.R. if he were to be returned to Father's care. Ferguson indicated that until mid-December 2020, Father contacted her weekly to check on I.R. but that after that time, she had had difficulty reaching him and it was "hit or miss" as to whether Father responded to her calls or text messages. She stated that she had scheduled several in-person appointments with Father to see how things were going and to "be there to support him if he need[ed] anything," but that Father had not kept the appointments for various reasons, i.e., because he was running errands with a family member, he was "busy" or he was not feeling well.

{¶ 36} With respect to visitation, Ferguson stated that "virtual visits" were available to Father but had not occurred because I.R. refused to participate.

Ferguson stated that Mother has never contacted her about I.R. and has never visited with him.

{¶ 37} Ferguson testified that I.R. is "doing so good" in his foster placement, has no special needs, is attending day care and is bonded with Foster Mother and his siblings. She stated that I.R. calls Foster Mother "mom," that he runs to her for comfort and that his face "lights up" when he talks about her. She indicated that Foster Mother wants to adopt I.R.

{¶ 38} With respect to why the agency was requesting permanent custody as opposed to seeking temporary custody of I.R., Ferguson stated that it was due to (1) "the inconsistency in the case plan before and case services not being completed," (2) the fact that "[t]he visits weren't always had" and "there's always been a reason why dad couldn't complete this or finish that for one reason or another" and (3) I.R. had previously been in this foster home since he was born, i.e., "[i]t's his stability." Ferguson stated that she believed it was in I.R.'s best interest to be committed to the permanent custody of the agency because "he's been in care almost his entire life," "[h]e needs a safe stable place to be at" and "he needs to be with his family."

{¶ 39} Foster Mother testified that her home was a certified foster home and that she had already adopted I.R.'s two siblings. She stated that when I.R. was returned to her care in September 2020, the children were "so happy" and "so excited," "like three little peas doing so much with each other," "[p]rotecting each other." Foster Mother indicated that she was bonded with I.R., that he was "a joy to

have" and that it was her intention to adopt I.R. if he was committed to the permanent custody of the agency.

{¶ 40} Foster Mother testified that she noticed significant changes in I.R. from the time he was removed from her care in March 2020 until he was returned to her care in September 2020. She stated that when I.R. first returned, he was "nervous" and "frightened," "looking around at people, looking for someone." He kept asking, "Am I staying here? Do I stay here? Can I stay here?" and could not keep food down for several days. She stated that he was also "angry," that he would "constantly hit on" his brother and that he would kick and scratch at Foster Mother when she tried to take him upstairs for a nap, stating, "No, no. I don't want to go upstairs." Foster Mother reportedly assured I.R. that no one was going to hurt him, that she loved him and that he was going to be okay. She stated that I.R. had never acted out like when he had been previously in her care and that this behavior subsided as he continued in her care.

{¶ 41} Foster Mother stated that, during the time I.R. resided with Father, she and his siblings had some, limited communication with I.R. but that they had no face-to-face contact with him.

{¶ 42} Foster Mother testified that I.R. has said that he does not want to visit with Father, that he does not want to leave her home and that he does not want to go back to Father. She stated that on days I.R. is supposed to have a virtual visit with Father, he is "a little bit more anxious" and does not want to eat.

{¶ 43} Father did not present any witnesses at the permanent custody hearing. His counsel requested that the juvenile court commit I.R. to the temporary custody of CCDCFS, rather than grant the agency permanent custody, so that Father could continue to work on his case plan.

**Guardian Ad Litem's Report and Recommendation**

{¶ 44} On March 1, 2021, the guardian ad litem filed a written report with the juvenile court in which he recommended that the agency be granted permanent custody of I.R. The guardian ad litem reported that he had made multiple attempts to contact Mother and Father by telephone and via letter but that he was not successful in reaching them.

{¶ 45} After the parties rested, the guardian ad litem testified regarding his recommendation that I.R. be committed to the permanent custody of the agency. The guardian ad litem reported that I.R. was bonded with his siblings and Foster Mother and that I.R. had indicated to him that he wished to stay with Foster Mother and his siblings. The guardian ad litem stated that, because he had been unable to reach Father, he could not speak to the condition of Father's home or to any interaction or bond between Father and I.R. The guardian ad litem indicated that he had attempted to speak with I.R. about visiting with Father but that I.R. seemed "withdrawn" and did not want to talk about it. The guardian ad litem stated that "[g]iven the history of the case," he believed it was in I.R.'s best interest for permanent custody to be granted to the agency.

**The Juvenile Court's Decision to Grant Permanent Custody of I.R. to CCDCFS**

{¶ 46} At the conclusion of the hearing, the juvenile court announced its findings on the record. The juvenile court found that CCDCFS had established, by clear and convincing evidence, that (1) I.R. could not be placed with either of his parents within a reasonable time or should not be placed with either parent and (2) it was in I.R.'s best interest to be committed to the permanent custody of the agency. As it relates to Father, the juvenile court explained its findings as follows:

> Dad has not abandoned him. That's clear in the fact that, you know, he has visited [I.R.] once, but despite the fact that he has visited him once and there may be — may have been attempts at other visits through other electronic means, they weren't consistent. And that's evidenced by the social worker's testimony.

> What's also been inconsistent is — and that goes to a lack of commitment from the dad — is his engagement with case plan services.

> Yes, he has completed three weeks of parenting, but according to — I think it's Ms. Ferguson, she gave him the referral when she got the case, and that was back in November, early part of December. He waited until almost three or four weeks expired before he decided that he's going to start engaging in the parenting classes.

> And what's even more troubling is the mental health, with his admission that he has suffered some trauma that has not been dealt with, so it's a recognition on his part that he has mental health issues that can interfere in his ability to provide appropriate care for [I.R.], and notwithstanding * * * an appointment on December 30th for him to come to the Juvenile Court for a diagnostic assessment, he didn't show up. And he still hasn't completed that assessment.

> And I think that also causes some alarm for the Court because not only his claim — or his individual report about past trauma, but I think the testimony from yesterday was about him indicating, Yeah, I recognize I've got anger management issues.

And that particular statement was made after showing him pictures of [I.R.] and injuries that had been caused to him with dad being the perpetrator — or alleged perpetrator at that point.

And so, you know, that's an issue, too, for the Court in terms of lack of commitment.

When we look at some of the other factors, commit an act of abuse. The Court has already made that determination, that, in fact, it was dad who was responsible for the injuries to [I.R.] and the Court did not find that those were justified injuries in an attempt to have [I.R.] avoid other harm. * * *

And so when you couple that with everything that the Court has previously stated, and the fact that the Guardian ad Litem has recommended that it is in [I.R.'s] best interest to be placed in the permanent custody of the Division of Children and Family Services, and the need for this child to have permanency. * * *

One final thing that the Court can use as a factor in making a decision in this case, what are the wishes of the child?

And here while we have the Guard ad Litem * * * who indicated that the child expressed to him that he wanted to remain with his foster mother and in his foster home with her and his siblings, he also indicated just by his behavior that he does not want to live with his father any longer, and apparently, is fearful that that is expressed in his refusal * * * to want to engage in phone conversations with his father, and being anxious and nervous when he had to even go to the one visit to see his father.

That is the physical manifestation of this child's desire not to return to an environment that he does not believe is safe.

And so the Court is going to find that the child cannot be placed with either parent, that includes both mom and dad, within a reasonable time or should not be placed with either parent within that time. And that's clear and convincing evidence that * * * the Agency has been able to establish with this Court.

And the Court also finds that it is in [I.R.'s] best interest to be placed in the permanent custody of the Division of Children and Family Services.

{¶ 47} On March 5, 2021, the juvenile court issued a journal entry terminating the parental rights of Mother and Father and committing I.R. to the permanent custody of CCDCFS. The trial court set forth its findings, announced at the hearing, that I.R. could not be placed with either of his parents within a reasonable time or should not be placed with either parent and that it was in I.R.'s best interest to be committed to the permanent custody of the agency.

{¶ 48} With respect to its determination that I.R. could not be placed with Father within a reasonable time or should not be placed with Father, the juvenile court specifically found:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.
>
> The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

{¶ 49} The juvenile court stated: "[F]ather has not completed case plan services; father has not engage[d] with any referrals for his mental health assessments or counseling and father stated that he has suffered past trauma and did not address or remedy any of those [sic] past history of said trauma."

{¶ 50} In determining that permanent custody was in I.R.'s best interest, the juvenile court indicated that it considered:

> the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents; the wishes of the child;

the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and the report of the Guardian ad Litem.

{¶ 51} The juvenile court also found that CCDCFS had made reasonable efforts to prevent removal of I.R., to eliminate the continued removal of I.R. from the home or make it possible for I.R. to return home and to finalize the permanency plan as it related to Father.

{¶ 52} Father appealed, raising the following two assignments of error for review:

First Assignment of Error: The trial court's award of permanent custody and termination of appellant's parental rights is against the manifest weight of the evidence.

Second Assignment of Error: Appellant was denied effective assistance of counsel and prejudiced thereby.

**Law and Analysis**

**The Juvenile Court's Decision to Grant Permanent Custody to CCDCFS**

{¶ 53} In his first assignment of error, Father argues that the juvenile court's decision to commit I.R. to the permanent custody of CCDCFS was not supported by clear and convincing evidence and was against the manifest weight of the evidence.

{¶ 54} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52

Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 55} Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, it is "an alternative of last resort," *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

**Standard for Terminating Parental Rights and Granting Permanent Custody to CCDCFS**

{¶ 56} An agency may obtain permanent custody of a child in two ways. *In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 44 (8th Dist.), citing *In re E.P.*, 12th Dist. Fayette Nos. CA2009-11-022 and CA2009-11-023, 2010-Ohio-2761, ¶ 22. An agency may first obtain temporary custody of the child and then file a motion for permanent custody under R.C. 2151.413, or an agency may request permanent custody as part of an abuse, neglect or dependency complaint under R.C. 2151.353(A)(4). *In re J.F.* at ¶ 44. In this case, the agency sought permanent custody for I.R. in its complaint.

{¶ 57} When proceeding on a complaint with an original dispositional request for permanent custody, the trial court must satisfy two statutory requirements before a child can be placed in the permanent custody of a children services agency. *In re J.F.* at ¶ 48. R.C. 2151.353(A)(4) provides that, if a child is adjudicated an abused, neglected or dependent child, the juvenile court may "[c]ommit the child to the permanent custody of a public children services agency," if the court determines (1) "in accordance with [R.C. 2151.414(E)] that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent" and (2) "in accordance with [R.C. 2151.414(D)(1)] that the permanent commitment is in the best interest of the child." In making these determinations, the juvenile court may not consider "the effect the granting of

permanent custody to the agency would have upon any parent of the child." R.C. 2151.414(C).

{¶ 58} "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence 'if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶ 59} "Clear and convincing evidence" is that "measure or degree of proof" that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re M.S.*, 2015-Ohio-1028, at ¶ 8. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Cross* at 477.

{¶ 60} In determining whether a child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, the juvenile court must consider "all relevant evidence," including specific factors enumerated in R.C. 2151.414(E). If the juvenile court finds by clear and convincing evidence that at least one of the enumerated factors in R.C. 2151.414(E) exists as to each of the child's parents, the juvenile court must find that the child cannot be

placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E).

{¶ 61} If the juvenile court finds that a child cannot be placed with either parent within a reasonable time or should not be placed with either parent in accordance with R.C. 2151.414(E), it must then consider whether committing the child to the permanent custody of the agency is in the child's best interest.

{¶ 62} The best-interest determination focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, at ¶ 59. In determining whether permanent custody is in the best interest of the child under R.C. 2151.414(D)(1), the juvenile court must consider "all relevant factors," including, but not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency and (5) whether any of the factors set forth in R.C. 2151.414 (E)(7) to (11) apply.[3]

---

[3] These factors include: whether the parent has been convicted of certain crimes, has withheld medical treatment or food from the child, has placed the child a substantial risk due to the parent's drug or alcohol use and rejected treatment, has abandoned the child or had had its parental rights terminated with respect to a sibling of the child. R.C. 2151.414(E)(7)-(11).

{¶ 63} The juvenile court is required to consider each factor listed in R.C. 2151.414(D)(1); however, no one factor is to be given greater weight than the others. *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Further, only one of the factors set forth in R.C. 2151.414(D)(1) need be resolved in favor of permanent custody to support a finding that permanent custody is in a child's best interest and to terminate parental rights. *In re J.C-A.*, 8th Dist. Cuyahoga No. 109480, 2020-Ohio-5336, ¶ 80; *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17; *In re N.B.* at ¶ 53.

{¶ 64} The juvenile court has considerable discretion in weighing the R.C. 2151.414(D)(1) factors. We review a juvenile court's determination of a child's best interest for abuse of that discretion. *In re P.B.*, 8th Dist. Cuyahoga Nos. 109518 and 109519, 2020-Ohio-4471, ¶ 76, citing *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47; *see also In re J.B.*, 2013-Ohio-1704, at ¶ 97 ("[T]he discretion that a trial court has in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.").

### The Juvenile Court's Findings in Support of Its Decision to Commit I.R. to the Permanent Custody of the Agency

{¶ 65} This is a difficult and unusual case. Based on the record before us, there appears to be little doubt that clear and convincing evidence supports the juvenile court's determination that it would be in I.R.'s best interest to be committed

to the permanent custody of the agency so that he could be adopted by Foster Mother and grow up with his biological siblings, with whom he is strongly bonded and with whom he has lived most of his young life, rather than with his Father, with whom I.R. has lived only six months, in whose care he has suffered physical injury and whom I.R. clearly fears and does not wish to visit — much less be returned to his care and custody.

{¶ 66} Indeed, Father does not challenge the juvenile court's finding that permanent custody would be in I.R.'s best interest. Rather, he simply asserts that the juvenile court's best interest determination is "irrelevant," i.e., that given that the juvenile court "erred in the first prong of the analysis, it never should have reached the second prong."

{¶ 67} In order to commit a child to the permanent custody of a public children services agency, however, the statute requires proof, by clear and convincing evidence, not only that permanent custody is in the best interest of the child, but also that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent. Thus, the issue in this case is whether the agency presented sufficient competent, credible evidence to support the juvenile court's finding, by clear and convincing evidence, that I.R. could not be placed with Father within a reasonable time or should not be placed with Father.

**{¶ 68}** The juvenile court found, as it relates to Father, that I.R. could not be placed with Father within a reasonable time or should not be placed with Father based on its determination that R.C. 2151.414(E)(1) and (4) applied:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.
>
> The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.[4]

**{¶ 69}** Based on its findings under R.C. 2151.414(E), the juvenile court was required to find that I.R. could not be placed with either of his parents within a reasonable time or should not be placed with either parent. *See, e.g., In re C.H.*, 8th Dist. Cuyahoga Nos. 82258 and 82852, 2003-Ohio-6854, ¶ 58, citing *In re Glenn*, 139 Ohio App.3d 105, 113, 742 N.E.2d 1210 (8th Dist.2000).

---

[4] As it relates to Mother, the juvenile court found that R.C. 2151.414(E)(10) and (11) also applied:

> The child is abandoned by the mother.
>
> The parent has had parental rights terminated with respect to a sibling of the child and the parent has failed to provide clear and convincing evidence to prove, that notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare and safety of the child.

There is no dispute in this case that the juvenile court made all of the requisite findings as it relates to Mother to support an award of permanent custody to the agency.

{¶ 70} Father contends that the juvenile court's findings under R.C. 2151.414(E)(1) and (4), as they relate to Father, do "not comport with the record" and are "against the manifest weight of the evidence." With respect to the juvenile court's finding under R.C. 2151.414(E)(1), he argues that the record does not demonstrate "by clear and convincing evidence" his "repeated and continuous failure" to remedy the situation that led to I.R.'s removal. He also challenges the juvenile court's finding that the agency made "reasonable efforts" to reunify I.R. with Father. Father asserts that the evidence shows that he was attending parenting classes and a support group for single fathers, that he is employed and has appropriate housing and that "the only thing [he] had not addressed was his own mental health." Father further notes that "a mere six months" had passed between the time I.R. was removed from Father's custody and the permanent custody hearing, that "the record does not show any effort by CCDCFS to reengage [Father] with regard to his mental health" and that this "[o]ne failure" is "hardly continuous and repeated."

{¶ 71} Father also argues that the record does not support the juvenile court's finding that Father has demonstrated a "lack of commitment" toward I.R. by failing to regularly support, visit or communicate with him when he was able to do so or by other actions showing an unwillingness to provide an adequate permanent home for I.R. In support of his contention, Father points to testimony by Ferguson that Father "often" contacted her regarding I.R. He also notes that there is no dispute that he is employed and that his home is suitable for I.R. Father argues that

he "tried to have contact" with his son and that I.R.'s reticence to participate in visitation with him should not be "twisted around" to suggest a lack of interest or commitment on the part of Father.

{¶ 72} The agency responds that Father's failure to attend the appointment for a mental health assessment, his "lack of engagement in anger management and mental health services," his failure to complete a nine-week parenting course in six months (allegedly "repeat[ing]" his failure to complete parenting classes when I.R. was previously taken into custody), his inconsistent communication with and failure to keep appointments with the agency and his failure to respond to the guardian ad litem's requests for contact, "taken together," clearly and convincingly demonstrate both "a pattern of repeated and continuous failures to remedy the problems leading to the child's removal" and a "lack of commitment" to I.R., supporting the juvenile court's findings under R.C. 2151.414(E)(1) and (4).

{¶ 73} There is limited information in the record regarding what Father did (or allegedly failed to do) during the time I.R. was previously in agency custody. Ferguson testified only that Father had not completed parenting classes; there is no indication that mental health services were then part of Father's case plan or that there were any concerns regarding excessive discipline by Father at that time.[5]

---

[5] As indicated above, although Ferguson testified at the dispositional hearing that Father did not complete parenting classes during the initial period I.R. was in custody, Sing testified at the emergency custody hearing that Father had completed a parenting program at that time. It is unknown, based on the record before us, which is correct. Regardless, given that there was no concern regarding anger management or excessive discipline during the time I.R. was previously in custody, presumably, the parenting classes to which Father was referred in connection with this case had a different focus.

{¶ 74} As to Father's efforts after I.R. was removed from his care on September 1, 2020, the record is somewhat limited and, at times, inconsistent with the SAR report filed with the juvenile court on March 2, 2021. Although the parenting classes to which Father was referred were described as a nine-week course (which Father reportedly began attending in late January), there was no testimony that Father had missed any classes, only that he had attended only three or four classes by the time of the March 4, 2021 hearing. And, as detailed above, the SAR report filed on March 2, 2021, suggests that Father was making some progress with that aspect of his case plan. With respect to Father's failure to complete a mental health assessment and to engage in any recommended mental health services, Ferguson testified only that a mental health assessment had been scheduled for Father for December 30, 2020 and that Father had failed to appear for the assessment. There was no testimony as to why Father failed to appear for the mental health assessment or whether any efforts were made to reschedule the assessment.

{¶ 75} On the other hand, the agency presented substantial, credible evidence that Father was not communicating consistently with the agency. Ferguson testified that she was repeatedly unable to contact Father by telephone, that Father missed multiple appointments with the agency and that Father failed to respond to efforts by the guardian ad litem to contact him. Although the record does not show any specific efforts by the agency to assist Father in rescheduling and completing his mental health assessment, without consistent communication back from Father and without Father's participation in scheduled meetings with the

agency, it would seem that there was little more the agency could do to assist Father in completing that aspect of his case plan.

{¶ 76} Issues with Father's communication with the agency also appear to have impacted his visitation with I.R. Although the record reflects that I.R. was reluctant to engage in any form of visitation with Father, it appears that even virtual visitation was rarely attempted due, in part, to Father's failure to consistently communicate with the agency.

{¶ 77} Although Father attempts to downplay the significance of his noncompliance with the mental health services element of his case plan, asserting that "the only thing [Father] had not addressed was his own mental health," the agency presented evidence that Father had expressly acknowledged that he had unaddressed trauma from his childhood that he believed played a role in the incident and impacted his ability to appropriately parent and discipline I.R. As such, Father's failure to take *any* steps during the six months I.R. was removed from his care to address this trauma is noteworthy and demonstrates a lack of commitment toward I.R.

{¶ 78} Further, although Father was not compliant with his case plan, we note that even "substantial compliance with a case plan" is not, in and of itself, "dispositive" and "does not preclude a grant of permanent custody to a social services agency." *In re J.B.*, 2013-Ohio-1704, at ¶ 90, citing *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.). This case is not just about Father's compliance (or lack of compliance) with case plan services. To be

reunified with I.R., Father needed to remedy the conditions that led to I.R.'s removal from the home, show that he could provide a safe, appropriate and loving environment for I.R. and do so within a reasonable time.

{¶ 79} In this case, although Father appears to have genuine affection for I.R. and a desire to parent him, the record shows that Father has never even acknowledged what happened to I.R. — much less taken any of the necessary steps to remedy the conditions that led to the August 31, 2020 incident and I.R.'s removal from his care. Father's conduct surrounding the August 31, 2020 incident is cause for great concern — not only due to his inappropriate, excessive discipline of I.R. — but also due to his actions in lying to the social worker about I.R.'s whereabouts and hiding I.R. from the social worker when she attempted to conduct a well check of I.R.

{¶ 80} Following careful consideration of the testimony presented at the permanent custody hearing, we find that competent, credible, clear and convincing evidence supports the juvenile court's findings that (1) the agency made reasonable efforts to make it possible for I.R. to return to Father's custody, (2) "notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems" that caused I.R. to be placed outside the home, Father has failed "continuously and repeatedly to substantially remedy the conditions" causing I.R. to be placed outside the home and (3) Father "has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to

provide an adequate permanent home for the child." Accordingly, the trial court did not err in committing I.R. to the permanent custody of CCDCFS.

{¶ 81} We overrule Father's first assignment of error.

**Effective Assistance of Trial Counsel**

{¶ 82} In his second assignment of error, Father argues that he was denied the effective assistance of trial counsel because (1) his trial counsel failed to timely file a motion to compel the production of Johnson's "investigative notes" concerning the events surrounding the removal of I.R. from Father's custody and (2) failed to investigate "the potential for independent witnesses to verify [Father's] version of events." Father contends that "what was known and said at the time of I.R.'s removal" was "absolutely critical" and that counsel's failure to perform these tasks resulted in prejudice to Father because it precluded "effective cross-examination" of Johnson and "severely hampered" "any effort to develop independent witnesses."

{¶ 83} The right to counsel, guaranteed in juvenile proceedings by R.C. 2151.352 and by Juv.R. 4, includes the right to the effective assistance of counsel. *See also In re M.I.S.*, 8th Dist. Cuyahoga No. 98138, 2012-Ohio-5178, ¶ 26 ("[T]the right to effective assistance of trial counsel attaches * * * to criminal proceedings and to proceedings for the permanent, involuntary termination of parental rights."), citing *Jones v. Lucas Cty. Children Servs. Bd.*, 46 Ohio App.3d 85, 86, 546 N.E.2d 471 (6th Dist.1988). "[T]he test for ineffective assistance of counsel used in criminal cases is equally applicable in actions seeking to force the permanent, involuntary termination of parental custody." *In re S.P.*, 8th Dist. Cuyahoga No. 110194, 2021-

Ohio-1822, ¶ 20, quoting *In re Heston*, 129 Ohio App.3d 825, 827, 719 N.E.2d 93 (1st Dist.1998).

{¶ 84} To establish ineffective assistance of counsel, the represented party must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the party, i.e., a reasonable probability that but for counsel's errors, the outcome would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome." *Strickland* at 694. Father has not met his burden here.

{¶ 85} First, trial counsel's failure to file a motion to compel the production of Johnson's investigative notes and failure to investigate potential witnesses who could support his version of events relate to the juvenile court's adjudication of I.R. as an abused and dependent child, not to its decision committing I.R. to the permanent custody to CCDCFS. Father has appealed only the juvenile court's judgment granting permanent custody of I.R. to the agency. He did not reference the juvenile court's adjudication order in his notice of appeal and has not included any assignment of error related to the adjudication of I.R. as an abused and dependent child in his appellate brief.

{¶ 86} Second, even assuming that Father's trial counsel were deficient in failing to compel the production of Johnson's investigative notes, he has not shown

that, but for counsel's errors, the outcome in this case would have been any different. The juvenile court's decision to award permanent custody to CCDCFS was based on (1) Father's conduct after I.R. was removed from his care, i.e., Father's failure continuously and repeatedly to substantially remedy the conditions causing the I.R. to be placed outside the home and lack of commitment toward I.R., and (2) the juvenile court's determination that committing I.R. to the permanent custody of the agency was in his best interest. Any potential inconsistency between Johnson's testimony in court and her investigative notes at the time of I.R.'s removal would not have impacted those determinations.

{¶ 87} Finally, with respect to counsel's alleged failure to investigate the "potential for independent witnesses," Father claimed that I.R. was scraped by a zipper when Father grabbed the back of I.R.'s hoodie to avoid him being hit by a car when they were walking to the store together. Although, in general, trial counsel has a duty to conduct a reasonable investigation or to make a reasonable decision that a particular investigation is unnecessary, *see, e.g., Strickland*, 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674, there is nothing in the record to suggest that anyone else witnessed the incident at issue who would have supported Father's version of events. Further, I.R.'s injuries, as depicted in the photographs taken by Johnson and admitted into evidence at the hearing, do not appear to be consistent with Father's version of events.

{¶ 88} Father's second assignment of error is overruled.

{¶ 89} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
EILEEN T. GALLAGHER, J., CONCUR